Filed 6/27/23  In re D.B. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re D.B. et al., Persons Coming Under the Juvenile Court Law. | B318484 (Los Angeles County Super. Ct. No. 20LJJP00294) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>T.B.,<br><br>        Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Philip L. Soto, Judge.  Affirmed.

Marissa Coffey, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Veronica Randazzo, Deputy County Counsel, for Plaintiff and Respondent.

_____

T.B. (mother) appeals from orders of the juvenile court terminating jurisdiction over three of her children and granting sole physical custody to the children's fathers. Mother argues the juvenile court failed to make findings regarding the children's best interests, and the evidence showed it was in their best interest for mother to share physical custody with the fathers.

Mother fails to show an abuse of discretion. The record indicates the children were thriving in their fathers' custody, whereas mother's care of the children was characterized by a lack of cooperation with court orders and multiple additional referrals to respondent Los Angeles County Department of Children and Family Services (DCFS). Accordingly, we affirm.

## BACKGROUND

We limit this summary to the information relevant to the issues on appeal. It is not intended to be comprehensive.

Mother has four children: minor 1, born 2006; minor 2, born 2013; minor 3, born 2018; and minor 4, born 2019. Father 1 is the father of minor 1, and was not party to the dependency proceedings. Father 2 is the father of minor 2. Father 3 is the father of minors 3 and 4.[1]

_____

[1] Given the many parties to this case, several of whom have the same initials, we designate the parties thusly to minimize confusion and preserve the anonymity of the children.

2

1.    *Petition and detention hearing*

On April 26, 2020, DCFS received a report that mother and father 3 had engaged in a violent altercation in front of the children.

Mother told an investigating social worker she was a single mother living with the children. Father 3, a truck driver, had his own residence but stayed with mother and the children on weekends. Mother reported that fathers 1 and 2 did not have visits or contact with their children, minors 1 and 2. Mother did not believe in immunizing the children and therefore was homeschooling minors 1 and 2. Mother did not work and received food stamps and other governmental financial aid.

Describing the reported violent incident, mother stated that she and father 3 had gotten into an argument while driving, and she had pulled the car over. Mother and father 3 then got out and continued the argument while standing in front of the car. Father 3 tried to take the car keys from her, and the two "began scuffling." Mother reported father 3 put her in a headlock and she bit him trying to escape. Minor 2, who was in the car, called the police.

Father 3 presented a different version of the incident, stating mother hit him repeatedly, and he struck her once in the face to stop her from hitting him. He then tried to take the key from the ignition, and mother started biting him. Father 3 also described an earlier incident in which he had told mother he wanted to break up, and she "barged" into the house where he was and struck him in the head. Father 3 stated mother had a temper, and "goes from 0 to 100 in seconds." Father 3 stated mother did not physically discipline the children, but "yells over the simplest thing." Father 3's roommate told the social worker

he believed mother had "mental issues," and father 3's mother stated mother had "an anger problem" and confirmed father 3's report that mother had struck him when he told mother he wanted to break up.

The detention report attached a police incident report regarding the altercation between mother and father 3. According to the incident report, mother told the police father 3 punched her twice in the face while she was still driving, and she pulled over. Father 3 then put mother in a headlock, and she bit him to try to get free. Minor 2 told the police he called 911 after father 3 punched mother in the face and put her in a headlock. Father 3 told police he tried to take the keys from the ignition, and mother hit and bit him. A police officer observed mother's cheek was bruised and swelling and her left hand was abraded. Father 3's right arm was bruised, red, and abraded. Minor 2 and the other two children present were uninjured.

DCFS filed a petition under Welfare and Institutions Code[2] section 300 alleging under section 300, subdivisions (a) and (b)(1) that mother and father 3 "engaged in a violent verbal altercation in the presence of the children." The petition alleged father 3 punched mother twice in the face while she was driving and put her in a headlock, after which she struck and bit him repeatedly as he continued hitting her. The petition further alleged mother had struck father in the head on a prior occasion.

On May 14, 2020, the juvenile court found DCFS had made a prima facie showing the children were persons described under section 300. The court further found there were reasonable

---

[2] All undesignated statutory citations refer to the Welfare and Institutions Code.

4

services available to prevent detention, and ordered minors 1 and 2 released to home of parents, and minors 3 and 4 released to home of mother. Father 3 was granted monitored visitation with minors 3 and 4. The court ordered family preservation services.

## 2. *Adjudication and disposition*

On June 3, 2020, the juvenile court found father 3 was the presumed father of minors 3 and 4, and ordered minors 3 and 4 released to both parents over DCFS's objection. A last minute information filed on or about the same date reported that father 2 was incarcerated as of March 2014, with a parole date in June 2020. A later report indicated father 2 was released on June 18, 2020. DCFS could not locate father 1.

At the time of the jurisdiction/disposition report, all four children were residing with mother. The report stated that mother "disagree[d]" with the section 300 petition's allegations, and was no longer in a relationship with father 3 nor did she communicate with him. She denied any prior incidents of domestic violence. Father 3 also disputed the petition's allegations, stating that mother had struck him, and he hit her by accident when trying to defend himself. Acknowledging his statement in the detention report that mother had hit him on a previous occasion, he said that previous incident also was " 'more of an accident.' "

A last minute information filed October 28, 2020 reported that mother had cancelled four sessions with the family preservation services provider, and was not very engaged in those services, although her engagement had improved in the prior two weeks. Mother had not cooperated with a domestic violence program intake assessment and had declined to provide DCFS with information necessary to provide additional referrals.

Additionally, DCFS had been unable to assess the children's health and developmental status because mother had declined to provide DCFS with the names of the children's health care providers or consent to release of medical records.

A supplemental report filed December 3, 2020 stated that minor 2 had missed 25 days of school and had completed only eight assignments. Minor 2's teacher had spoken with mother many times and mother did not agree with the teacher that there were any problems, and often would not answer her phone when the teacher called. Mother also did not respond to mental health service referrals for the children.

A last minute information filed February 25, 2021 stated that mother had declined family preservation services and was not cooperating with signing necessary release documents. Mother also was not cooperating with mental health and regional center workers who were attempting to establish services for the children. DCFS had discussed this with mother but she "ha[d] not changed her behavior."

A supplemental report filed March 1, 2021 stated that a paternity test confirmed that father 2 was minor 2's biological father. Father 2 said he was having trouble setting up visits with minor 2 because mother made it difficult and only wanted to argue with him when he called.

The report further stated that mother had ceased participating in family preservation services, but had enrolled in a parenting course. Father 3 had not yet enrolled in any programs. Minor 1 was receiving Cs, Ds, and Fs in school and had a grade point average of 1.00, with excessive absences. Minor 2's attendance, however, had improved.

The juvenile court held an adjudication hearing on March 3, 2021. The court sustained the allegations in the petition against mother and father 3. The court ordered mother and father 3 to complete domestic violence and parenting programs, and to participate in individual counseling. The court removed minors 1 and 2 from the homes of their fathers and placed them in the home of mother. The court ordered minors 3 and 4 to home of parents, i.e., mother and father 3. The court ordered mother and father 3 to make the children available for unannounced home visits from DCFS.

### 3. *Family maintenance period*

On March 29, 2021, a caller reported to DCFS that minor 2 appeared to be participating in online school in a closet, and mother resisted speaking with the caller about it or allowing minor 2 to speak with the caller. Minor 2 was not completing his schoolwork and was "failing." On April 2, 2021, DCFS received another report of educational and medical neglect of a child, although the record does not indicate to which child the report referred.

On April 20, 2021, a caller reported to DCFS that the caller had observed minor 2 sitting next to his mother with a visible black eye. Minor 2 told the caller he was not allowed to speak to the caller. Caller further stated that four days earlier, someone had thrown a juice bottle at minor 2 while he was engaged in online learning, striking him in the face.

On April 21, 2021, a DCFS social worker and sheriff's deputy inspected mother's home. Minor 1 reported no abuse and said he felt safe in the home. Minor 2 reported no physical discipline and said he was "fine." The social worker observed a

7

small scratch or scar on minor 2's forehead, but no bruising or trauma to his eyes.

Social workers and a deputy visited mother's home again on April 23, 2021 with an investigative search warrant, with the goal of the social workers speaking to the children outside of mother's presence. Mother became agitated and yelled at the social workers. A social worker nonetheless spoke with minor 2 privately, although minor 2 noted mother was watching him and "appeared . . . scared of his mother if he was talking to [social workers]." Minor 2 again denied any physical abuse, and said his little brother (minor 3) had thrown the bottle at him, but it did not hurt. Minor 2 denied being put in a closet. The social worker also spoke with minor 1, who also denied any physical discipline or domestic violence.

On May 7, 2021, DCFS obtained a removal warrant for the children based on mother's failure to comply with court orders. DCFS removed the children on May 12, 2021, placing minors 1 and 2 in a foster home, and minors 3 and 4 with their paternal grandmother at father 3's request.

DCFS filed a new detention report describing the March and April referrals and investigation described above. The report stated that mother had not allowed the court-ordered unannounced home visits, and had been "disrespectful and verbally assaultive" to DCFS social workers. Mother had declined or not followed through with services for the children, including mental health, regional center, and school services. She had failed to provide medical information about minor 1's diabetes, and had not responded to requests from minor 2's school. DCFS stated that mother was "unable to demonstrate that the children's medical, developmental, mental health and

educational needs are being met." On several occasions, mother refused to discuss her case plan with DCFS or sign consent forms for her children to obtain services.

DCFS also filed a supplemental dependency petition under section 387 alleging mother was noncompliant with court orders, specifically by failing to participate in programs and counseling, provide DCFS with the children's health and medical updates, and sign consent forms for the children's services.

A last minute information filed May 19, 2021 indicated that, after removal of the children, mother had not responded to DCFS's requests to obtain the children's medication and computers for online school.

That same day, the juvenile court ordered the children detained from mother, with family reunification services and monitored visitation for mother.

### 4.    *Second adjudication*

DCFS filed a jurisdiction and disposition report on June 4, 2021. According to the report, mother denied that minor 2's school had reached out to her repeatedly about minor 2's behavior and academic performance, stating the school had contacted her only about immunizations, and on one occasion minor 2's teacher contacted her when minor 2 became upset when the teacher did not call on him. Mother denied placing minor 2 in a closet, and believed minor 2's teacher had "developed false perceptions about her." Mother believed her children were turning in their school assignments, and her focus was ensuring they turned in their assignments as opposed to ensuring they checked in for online learning on Zoom.

Mother said she was unaware she had to sign any documents for her children to receive services, but she was

9

willing to do so. She stated she had provided DCFS with the children's medical documents and verification of her participation in a parenting program, and did not know why the detention report said otherwise. She believed the social worker assigned to the case had " 'created a false narrative.' " Mother's resistance to home visits arose from her discomfort with that social worker. Mother stated she had enrolled in a number of services and would provide DCFS with confirmation.

Father 3 said he had no concerns about the children's safety with mother. Father 2 stated mother had not allowed him to visit with minor 2 since July 4, 2020, and would not allow him to speak with minor 2 on the phone.

Minor 1 stated he was happy and safe when living with his mother, and denied domestic violence or physical discipline. Minor 2 gave similar statements.

Minors 1 and 2's caregiver reported that mother spoke negatively to the children during phone calls. Minor 2 would cry when mother called, and minor 1 said he would prefer not to speak to mother rather than hear her cry. The caregiver said mother told the children the caregiver was "the devil and their enemy," accused the caregiver of brainwashing the children, and made other derogatory remarks to the children about the caregiver.

A DCFS social worker monitored a visit between mother and minors 1 and 2 on June 2, 2021, and reported the visit went well and mother's interactions with the children were appropriate.

On June 14, 2021, the juvenile court sustained the section 387 supplemental petition "as amended." Because the record before us does not contain an interlineated petition or a reporter's

10

transcript from the adjudication hearing, we cannot determine the nature of those amendments.

### 5. *Second disposition*

A last minute information filed July 20, 2021 reported that minors 1 and 2 were in summer school. A DCFS social worker reported positive and appropriate visits between mother and the children. Mother continued to refuse to sign releases for the children's medical information. Father 3 similarly refused to sign, which led DCFS to suspect "that the mother may be influencing the father."

DCFS reported challenges in obtaining minor 1's diabetes medication from mother. Mother did not respond when a social worker reached out to arrange a meeting to obtain the medication. Mother later told DCFS she had given the medication to the visitation monitor, but the monitor informed DCFS mother had given him only enough medication for a few days. A DCFS social worker finally picked up the remainder of the medication from mother and delivered it to minor 1's caregiver.

DCFS reported a positive visit between father 2 and minor 2. DCFS was in the midst of assessing whether father 2 would be an appropriate placement for minor 2.

Another last minute information filed July 22, 2021 stated mother had completed a parenting class, but only recently enrolled in individual counseling and a domestic violence program. DCFS was trying to determine if the domestic violence program was for perpetrators, as ordered by the court, or for victims.

A last minute information filed six days later reported that DCFS had confirmed that mother had participated in several

domestic violence and parenting classes and 12 individual counseling sessions. Father 3 had enrolled in a domestic violence program, and stated he was scheduled to begin a parenting class.

The juvenile court held a disposition hearing on August 3, 2021. Only the minute orders pertaining to minors 1 and 4 appear in the record, although those orders refer to the other children as well. Minor 4 (and presumably minor 3) were released to father 3, who was granted family maintenance services. Minor 1 (and presumably minor 2) remained "in Suitable Placement" under DCFS supervision. Mother was granted reunification services as to minors 1 and 2, and enhancement services as to minors 3 and 4. The court granted father 2 unmonitored visits with minor 2, with occasional overnight visits.

A last minute information filed August 26, 2021 contained DCFS's positive assessment of father 2's ability to care for minor 2. The juvenile court released minor 2 to father 2 on September 3, 2021, with mother to have virtual visits.

**6.      *Status review reports***

DCFS filed status review reports for the children on January 20, 2022.[3] Mother had provided DCFS with completion certificates from her programs and "has been compliant with both her [court-ordered] services and the DCFS case plan goals." Mother had been cooperative with DCFS, making herself available for visits and responding to DCFS communications. Mother informed DCFS she had completed a court-ordered

---

[3] DCFS filed three status reports, one for minor 1, one for minor 2, and one for minors 3 and 4.

psychological assessment, but had not yet provided that assessment to DCFS.

Mother's individual counselor reported that mother "has been dedicated to her personal healing process, being a survivor of domestic violence and has remained motivated to learn new parenting and emotional regulation skills." The counselor reported, however, that mother "is not yet willing to apologize for her role in having her children removed from her care." (Boldface omitted.)

### a. Status of minor 1

Minor 1 said he enjoyed living with his caregiver but " 'can't wait' to 'go back to live' with mother." Mother's monitored visits with minor 1 were going well, and the monitor and caregiver stated they had no concerns about minor 1's safety with mother. DCFS recommended the juvenile court retain jurisdiction over minor 1 and that he remain with his caregiver.

### b. Status of minor 2

Minor 2 "appears to be happy and physically healthy under the care of his father, who provides [minor 2] with a safe and loving home, with no safety concerns observed by [the social worker] during monthly visits." Minor 2 stated he felt safe with his father, and enjoyed going to the park with him. He stated that he missed his mother and siblings and would like to live with them again. DCFS had liberalized mother's visits with minor 2 to unmonitored.

Father 2 had initiated an evaluation for special education services for minor 2, and "[d]ue to father's persistence, [minor 2] was linked to mental health services and meets weekly with [a clinician]." Father 2 had discovered minor 2 had difficulties

13

cleaning himself properly after using the bathroom, but had shown improvement after father 2 began working on it with him. Through the mental health services obtained by father, Minor 2 was diagnosed with ADHD.

Father 2 had been diligent in completing his court-ordered parenting class and had cooperated with DCFS in making himself and minor 2 available for monthly visits from the social worker. Father 2 was consistently testing negative for drugs, and had complied with all terms of his parole. Father 2 reported that he was happy to have minor 2 in his home so they could bond and build their relationship. He reported seeing "a lot of growth" in minor 2 since minor 2 had started living with him, including improving in following instructions, and letting father 2 know when minor 2 needed help.

DCFS recommended the juvenile court terminate jurisdiction over minor 2 with a custody order granting joint legal custody to mother and father 2, and sole physical custody to father 2 with unmonitored visits for mother.

### c. Status of minors 3 and 4

Minors 3 and 4 continued to reside with their paternal grandmother at father 3's request, given his work schedule. The children were "well-adjusted" and paternal grandmother "provides them with a stable home and healthy environment." The children were "thriving under the care of their paternal grandmother and father." The social worker observed the children's excitement when father 3 came home, running towards him and jumping into his arms. The social worker had no safety concerns.

Paternal grandmother monitored minors 3 and 4's visits with mother, and reported the children enjoyed their visits very

14

much and were always excited to see mother.  The visits were positive and appropriate with no safety concerns.

Father 3 was consistent in meeting with a family preservation counselor every week, and the counselor reported father 3 was "open and honest about what brought his family to the attention of DCFS."  DCFS reported father 3 was compliant with his court-ordered services and case plan goals.  He had completed parenting classes and had three sessions left in a six-month domestic violence course.  Although father 3 had not yet enrolled in individual counseling, DCFS concluded this was "not because of his lack of effort," but because of problems with insurance and obtaining low-cost counseling.

DCFS's most recent risk assessment of father 3 rated him a low risk due to his "demonstrating new skills consistent with case plan objectives and having no new substantiated referrals.  Additionally, the father has been providing for the child[ren] and ensuring that [their] needs are being met since . . . the child[ren were] released [to] his care.  The father has been compliant with all Court ordered services and DCFS case plan goals and therefore, there is no need for continued in-home services."

DCFS recommended the juvenile court terminate jurisdiction over minors 3 and 4 with a custody order granting joint legal custody to mother and father 3, and sole physical custody to father 3 with unmonitored visits for mother.

### d.    Last minute information regarding mother's psychological assessment

A last minute information filed February 1, 2022 indicated mother had given DCFS her psychological assessment completed by a therapist with the Department of Mental Health.  DCFS had concerns with the validity of the assessment "due to mother's

responses being inconsistent with information provided to [DCFS] by mother and other sources."

Specifically, mother told the therapist she had never used alcohol or drugs, but earlier had told DCFS that she drank alcohol, just not to excess. Mother also had been arrested in 2011 for possession of a controlled substance. Mother told the therapist she was not employed, but she told DCFS she worked full-time as a receptionist. Mother told the therapist she had no criminal or legal history apart from an open domestic violence case, but DCFS's review of mother's criminal history indicated she had been arrested 11 times, had spent a combined 71 days in jail, and had been on probation for burglary in 2012. Mother told the therapist there was no history of incarceration among her immediate family, but when DCFS assessed a maternal aunt as a potential visitation monitor, DCFS discovered she had "too many hits" on the criminal background check. (Boldface omitted.)

The therapist conducting the assessment further noted she had conducted the interview with mother over the phone, and therefore could not complete mother's adult mental status exam, or evaluate whether mother was under the influence of drugs or alcohol. DCFS expressed concern "as to the validity, completeness and thoroughness of the assessment." (Boldface omitted.)

### 7.    *Review hearing*

The juvenile court held a review hearing on February 3, 2022. The hearing began with argument concerning minor 1 and whether he should be returned to mother's care. Mother's counsel argued mother had complied with her case plan and the court should return minor 1 to her. Mother's counsel contended the counselor's observation that mother was not yet willing to

16

apologize for her role in having the children removed was outweighed by the evidence demonstrating mother's progress and compliance. Anticipating an argument that mother had not provided the caregiver with minor 1's diabetes medication, mother's counsel argued minor 1's good health disproved that allegation.

Children's counsel argued mother "is just going through the motion[s]," and is "not taking accountability." Children's counsel contended mother was interfering with minor 1's relationship with his caregiver, talking to minor 1 about the case and telling him not to listen to the caregiver. Children's counsel further contended mother was providing minor 1 with his diabetes medication only on visits, and not ensuring the caregiver had the medication.

DCFS counsel also argued mother was "going through the motions, getting things completed but not really getting why we are all here, why [minor 1] has been removed from her." DCFS counsel noted DCFS's concerns in the last minute information regarding mother's psychological assessment. DCFS requested that minor 1 remain with his caregiver and the court order continued family reunification services for mother. The juvenile court agreed with DCFS, ruling that minor 1 would remain with his current caregiver with unmonitored visits for mother.

The parties then addressed the status of minors 2, 3, and 4. The juvenile court incorporated mother's arguments regarding minor 1 into her arguments for the other children. Mother's counsel argued that if the court was not inclined to grant mother joint physical and legal custody with fathers 2 and 3, then the court should issue a home of parents order and retain jurisdiction so the children could transition back to mother's care. Mother's

counsel noted mother's case progress and the fathers' statements that they had no safety concerns about mother. Mother's counsel further noted father 3, who "was just as much a part of the original petition as mother," had yet to complete his domestic violence program or participate in individual counseling.

The juvenile court granted sole physical custody of minors 2, 3, and 4 to their respective fathers. Mother was granted joint legal custody with the fathers, but the fathers were given tie-breaking authority. Mother was granted unmonitored visits. The juvenile court ordered jurisdiction over minors 2, 3, and 4 terminated, and stayed that order pending receipt of the custody orders.

Mother timely appealed.

## DISCUSSION

On appeal, mother contends the juvenile court abused its discretion by denying her joint physical custody of minors 2, 3, and 4. Mother raises no arguments concerning minor 1.

When the juvenile court determines supervision of a child no longer is necessary, " '[t]he court shall terminate its jurisdiction unless the social worker or his or her department establishes by a preponderance of evidence that the conditions still exist which would justify initial assumption of jurisdiction under Section 300, or that those conditions are likely to exist if supervision is withdrawn.' [Citations.]" (*In re T.S.* (2020) 52 Cal.App.5th 503, 513, quoting § 364, subd. (c).) When the court terminates jurisdiction, it may issue a custody and visitation order under section 362.4. (*T.S.*, at p. 513.)

"When making a custody determination under section 362.4, 'the court's focus and primary consideration must always be the best interests of the child.' [Citations.]" (*T.S., supra,*

18

52 Cal.App.5th at p. 513.)  The court " 'is not restrained by "any preferences or presumptions," ' " and need not, for example, award joint physical custody merely because " 'neither parent poses any danger to the child.' " (*In re Maya L.* (2014) 232 Cal.App.4th 81, 103.)

We review custody orders issued upon termination of jurisdiction for abuse of discretion.  (*In re C.W.* (2019) 33 Cal.App.5th 835, 863.)

Mother argues the juvenile court never considered the best interests of the children because it made no findings on the record as to their best interests.  Mother cites no authority that a juvenile court must make express findings when issuing a custody order, and indeed the case law is to the contrary.  (See *In re Jennifer R.* (1993) 14 Cal.App.4th 704, 713–714 ["The Welfare and Institutions Code does not require a specific statement of reasons be given when making a custody order."].)  Mother's argument is further undercut by the fact that she never requested the juvenile court articulate its reasons.  (*Jennifer R.,* at pp. 713–714 [noting the appealing parent did not request a statement of reasons].)

Also, the juvenile court did make express findings as to minor 1, concluding mother "appears not to be totally grasping the concepts that are necessary to keep the child safe," and expressing concern that mother was impeding, or had in the recent past impeded, minor 1's access to medication and educational services.  We reasonably may presume that the court's stated concerns about minor 1's safety extended to his younger half siblings, and informed the court's determination that it was not in the children's best interest to be in mother's physical custody.

19

Mother argues she would be the better custodian for minors 3 and 4 because she was in "full compliance with the case plan," whereas father 3 had yet to complete his case plan, and had placed minors 3 and 4 with paternal grandmother rather than caring for them himself. She further argues it was in minor 2's best interest to be placed in mother's custody given mother's compliance with her case plan and the fact that minor 2 had lived with her most of his life, and had stated he loved and missed his mother.

We disagree with mother's implication that the record does not support the juvenile court's conclusion that it was in the children's best interest to be in their fathers' custody. The reports uniformly indicated that minors 2, 3, and 4 were safe, happy, and thriving in their fathers' custody. There had been no further referrals since the children were placed with their fathers, nor any indication of concerns about safety or other issues.

In contrast, when earlier in the proceedings the juvenile court had placed the children in mother's care, that period was characterized by mother's resistance to court-ordered services, multiple referrals, and, ultimately, the removal of the children from her care at a second detention hearing. Although mother had shown improvement in the months prior to the review hearing, it is difficult to argue she was the better choice for custody when one compares her history throughout the case to the history of fathers 2 and 3.

It is true father 3 had not completed his court-ordered services, but the juvenile court reasonably could conclude that was outweighed by evidence of how well the children were doing in his custody. Also, the record contains evidence suggesting

father 3 had made more progress than mother, because his counselor reported he was "open and honest about what brought his family to the attention of DCFS," whereas mother's counselor stated mother "is not yet willing to apologize for her role in having her children removed from her care." (Boldface omitted from second quotation.) Mother argues her case progress obviated the need for any express acknowledgement of her role in the family's difficulties, but the juvenile court was entitled to conclude otherwise.

It is of no moment that father 3 placed minors 3 and 4 with paternal grandmother rather than caring for them himself. If anything, it is a sign of responsible parenting that father 3 determined his work schedule would impede his ability to care for the children, and that paternal grandmother was a better choice. The evidence of how well the children were doing in their grandmother's care further supports father 3's decision.

## DISPOSITION

The juvenile court's custody orders and orders terminating jurisdiction as to minors 2, 3, and 4 are affirmed.

NOT TO BE PUBLISHED.

BENDIX, J.

We concur:

ROTHSCHILD, P. J.          CHANEY, J.

21